**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | **CHAPTER 7** |
| | ) | |
| **CLAY GAMBLE,** | ) | |
| **SHEILA LEE GAMBLE,** | ) | |
| | ) | **CASE NO. 05-71639** |
| | ) | |
| **DEBTORS.** | ) | |

<u>**MEMORANDUM DECISION**</u>

The matter before the Court is the United States Trustee's Motion to Dismiss

Pursuant to 11 U.S.C. § 707(b) filed July 15, 2005 in which the United States Trustee alleges that

the Debtors, Clay and Sheila Gamble, have available disposable income to make a substantial

repayment of their unsecured debt over the course of a thirty-six month chapter 13 plan and that

their bankruptcy filing constitutes a "substantial abuse" of the provisions of Chapter 7 of the

Bankruptcy Code. This Chapter 7 case was filed on April 27, 2005 and therefore this case is

controlled by the law in effect prior to the adoption of the Bankruptcy Abuse Prevention and

Consumer Protection Act of 2005 (BAPCPA). This matter was set for trial and heard on April

19, 2006. The matter has been fully briefed by the parties and is now ready for decision. For the

reasons stated below, the Court will deny the United States Trustee's Motion.

FINDINGS OF FACT

Federal Rule of Bankruptcy Procedure 1017(e)(1) requires the United States

Trustee with regard to a motion to dismiss for alleged substantial abuse to "set forth in the

-1-

motion all matters to be submitted to the court for its consideration at the hearing." The matters relied upon by the United States Trustee may be summarized as follows. The Debtors inflated certain household expenses listed on Schedule J, specifically baby sitting, child care and incidental expenses. It is claimed that the Debtors have "$700.00 per month in questionable expenses. From this amount, [the Debtors] have available disposable income to make a substantial repayment of their unsecured debt over the course of a 36 month chapter 13 plan." (Mot. Dismiss 4-5.) The Debtors' bankruptcy filing was not precipitated by sudden illness, calamity, disability or unemployment. The Debtors are asserted to have lived beyond their means as evidenced by the Debtors' scheduled unsecured nonpriority debts totaling $23,415.37, comprised primarily of credit cards and personal loans. "In addition, it appears that the debtors have resorted to borrowing against an older truck, have failed to pay taxes, and continue to borrow despite their failure to pay their existing creditors." (Mot. Dismiss 6.) The United States Trustee finds it troubling that the Debtors "continue to make monthly payments on certain dischargeable unsecured loans while failing to pay most of their other creditors." (Mot. Dismiss 7.)

The Debtors are married and have one preschool aged child who lives with them. Mrs. Gamble's 17-year-old daughter from a previous marriage also lives with the Debtors.[1] The Debtors have a joint checking account into which both incomes are deposited. Mrs. Gamble pays all expenses, regardless if joint or separate obligation, out of this joint account.

---

[1] The Court notes that the Debtors reported three dependents on Schedule I - their daughter and Mrs. Gamble's daughters from a previous marriage. Mr. Gamble testified that Mrs. Gamble's 19-year-old daughter moved out of the Debtors' home before the Debtors filed bankruptcy.

-2-

In August 2004, Mrs. Gamble was forced to find another job as her employer closed. After searching for approximately two weeks, Mrs. Gamble was hired by Frontier Health as a home-health aid. Mr. Gamble is employed by P.M. Transport as a truck driver/gas hauler. In September 2004, Mr. Gamble suffered a back injury. As a result, he was unable to work for approximately two months.[2] During this time, Mr. Gamble received short-term disability insurance payments equal to 60% of his regular pay. Mr. Gamble's regular pay is calculated as 24% of each load of gas he hauls. Accordingly, Mr. Gamble testified that his 2004 income would have been higher if he had not been hurt, but he was not certain how much higher. On the Statement of Financial Affairs, the Debtors reported their 2004 joint gross wages as $65,772.00 and their 2003 joint gross wages as $64,089.00. The Debtors had an adjusted gross income of $67,306 per their 2004 federal income tax return and $64,889 reported on their 2003 federal income tax return.

On Schedule I the Debtors represented that Mr. Gamble had gross monthly income of $4,430.05, which after payroll deductions of $1,290.90[3] left a net disposable income of $3,139.16 per month.[4] The Debtors reported that Mrs. Gamble had a gross monthly income of $1,157.00, which after payroll deductions of $194.48 left a net disposable income of $1,339.52. Mrs. Gamble receives $377.00 per month in child support bringing her monthly net disposable

---

[2] On October 5, 2004 Mr. Gamble had back surgery and returned to work on November 15, 2004.

[3] Among these deductions is Mr. Gamble's $232.52 per month contribution to his "401K" retirement account which has been challenged by the United States Trustee and included in his calculations determining the Debtors' disposable income available to pay creditors.

[4] The Debtors stated that Mr. Gamble's "income fluctuates and is never the same." (Debtors' Schedule I.)

income to $1,339.52.[5]  Further, the Debtors explained that "both received over time pay on recent

checks to help with expenses and debt load. However, [the Debtors] will not continue with

overtime work indefinitely." (Debtors' Schedule I.) Against a combined monthly income of

$4,478.68, the Debtors reported monthly living expenses of $4,944.04, approximately $465 more

than their reported net monthly income.  At trial, a post-petition budget prepared by Mrs. Gamble

reporting monthly expenses of $4,098.00 was admitted into evidence as Debtors' Exhibit I.  The

parties stipulated that Debtors' Exhibit I is an accurate calculation of the Debtors' monthly

expenses as of the day of trial, April 19, 2006. The itemization of the monthly expenses as

reported on Schedule J and Debtors' Exhibit I is as follows:

|  | Schedule J | Debtors' Ex. I |
|---|---|---|
| Mortgage Payment | $834.38 | $835.00 |
| Electricity and Heating Fuel | $190.00 | $170.00 |
| Water and Sewer | $30.00 | $15.00 |
| Telephone | $50.00 | $45.00 |
| Cable TV | $59.00 | $59.00 |
| Cell Phone | $79.00 | $89.00 |
| Garbage Removal | $15.00 | $22.00 |
| Home Maintenance (repairs and upkeep) | $50.00 | $20.00 |
| Food | $700.00 | $575.00 |
| Clothing | $100.00 | $35.00 |
| Laundry and Dry Cleaning | $100.00 | - |
| Medical and Dental Expenses | $80.00 | $115.00 |
| Transportation (not including car payments) | $350.00 | $442.00 |
| Recreation | $200.00 | $160.00 |
| Auto Insurance | $126.00 | $136.00 |
| Personal Property Taxes | $4.37 | $50.00 |
| Auto Payment | $326.00 | $326.00 |
| IRS Payment | $60.00 | $60.00 |
| Pioneer Credit Payment[6] | $220.29 | - |

[5] On Schedule I the Debtors noted that Mrs. Gamble would quit receiving child support
for her 17-year-old daughter in November 2005.

[6] Pioneer Credit's lien on the Debtors' 1979 Ford truck was released on August 18, 2005
pursuant to the Court's order of the same date.

| | | |
|---|---|---|
| Superior Financial Payment[7] | $178.00 | $60.00 |
| VA Department of Taxation Payment | $100.00 | $100.00 |
| World Financial Payment[8] | $77.00 | - |
| Babysitting Costs Other Than Day Care | $160.00 | - |
| Child Day Care | $325.00 | $300.00 |
| Food and Other Incidental Expenses While Working | $250.00 | $180.00 |
| Haircuts, Hygiene Items and Household Incidentals | $200.00 | $165.00 |
| Maintenance, Care and Food for Pets | $80.00 | $24.00 |
| Birthdays | - | $15.00 |
| Christmas | - | $35.00 |
| H&R Block | - | $25.00 |
| Church Tithes/Offerings | - | $40.00 |
| **Total Expenses** | **$4,944.04** | **$4,098.00** |

The schedules reported that the Debtors owned real estate valued at $116,600.00 as tenants by the entirety and subject to a mortgage totaling $118,657.67. The Debtors reported personal property totaling $10,212.53, all of which was claimed as exempt except for Mr. Gamble's term life insurance policy valued at $1.00 and a 1998 Buick Riviera valued at $6,950.00.[9]

Aside from the mortgage, the Debtors reported secured debt totaling $10,307.20 on Schedule D, comprised of Onyx Acceptance's claim of $9,155.60 secured by the 1998 Buick Riviera valued at $6,950.00 and Superior Financial's claim of $1,151.60 secured by a 1979 Ford truck valued at $100.00. The Debtors filed a Statement of Intention in which they indicated their

---

[7] On August 18, 2005, the Court entered an order allowing the Debtors to redeem Superior Financial's lien on the 1979 Ford truck by paying $1,100.00 at 10% interest, in twenty-one monthly payments of $57.32.

[8] On June 10, 2005, the Debtors filed a Motion to Avoid the Lien of World Financial in the Debtors' household goods, specifically a DVD player, two speakers, stereo, big screen TV, computer, video camera, riding lawn mower and clock. An order granting the Motion and directing World Financial to release such liens was entered on August 8, 2005.

[9] On September 21, 2005, the Debtors filed an amended Schedule B and Schedule C.

plan to redeem the 1979 Ford truck pursuant to 11 U.S.C. § 722[10] and continue making regular

payments to Onyx Acceptance. The Debtors reported unsecured priority claims totaling

$4,449.30[11] and general unsecured claims totaling $23,415.37, comprised of eleven medical bills

totaling $7,655.11, four credit cards accounts with a combined total balance of $2,391.00, two

personal loans in the aggregate amount of $2,985.52[12] and fifteen open accounts with a combined

balance of $10,383.74. The Debtors have not made any contention that these debts are not

"consumer debts" within the meaning of 11 U.S.C. § 707(b) or that such status has not been

proved. The medical bills constitute 32.7% of their general unsecured obligations.

      Contrary to the assertion made in the United States Trustee's Motion that the

Debtors' bankruptcy was not precipitated by sudden illness, calamity, disability or

unemployment, the Debtors argue that several calamities occurred which led them to file

bankruptcy. First, Mrs. Gamble lost her job in August 2004 and was out of work for

approximately two weeks. Second, Mr. Gamble injured his back in September 2004 and was

unable to work for nearly two months. Third, in February 2005 Mr. Gamble's wages were levied

---

[10] On June 10, 2005, the Debtors filed a Motion to Redeem Property seeking to pay
Superior Financial $100.00, the value of the 1979 Ford truck. Superior Financial filed an
Objection to the Debtors' Motion on June 17, 2005 arguing that the value of the truck is
$1,775.00, which is greater than their claim and as such the Debtors should pay their claim of
$1,461.32 in full. On July 26, 2005, the Debtors filed an amended Motion to Redeem adding
Pioneer Credit as a party. Pioneer Credit filed an Objection to the amended Motion valuing the
truck at $1,775.00 and seeking payment of their claim after payment in full of Superior
Financial's claim. An order entered on August 18, 2005 valued the truck at $1,500.00, directed
the Debtors to pay Superior Financial the sum of $1,100.00 at 10% interest, in twenty-one
monthly payments of $57.32 and released Pioneer Credit's lien on the truck.

[11] IRS claim of $3,420.15 for 2002 income taxes; a $31.57 claim held by the Russell
County Treasurer for 2004 personal property taxes; and a Virginia Department of Taxation claim
of $997.58 for 2002 income taxes.

[12] The Debtors in Schedule J provide for monthly payments on both of these loans -
$220.29 per month to Pioneer Credit and a $77.00 monthly payment to World Financial.

-6-

upon for unpaid medical bills.[13] From February 11, 2005 to February 25, 2005, $751.10 was

garnished from Mr. Gamble's paycheck. In their post-trial argument to the Court, the Debtors

state "[t]he actual precipitating factor that led to the filing of the bankruptcy was a garnishment

that was obtained by one of [the Debtors'] medical providers." (Debtors' Br. 5.) As Mr. Gamble

further explained at trial, Mrs. Gamble met with the Debtors' counsel in February 2005. Upon

counsel's advice, Mr. Gamble filed a homestead deed in the Clerk's Office of Washington

County on February 17, 2005 claiming as exempt $1,285.96 in funds garnished from Mr.

Gamble's paycheck from February 3, 2005 to February 24, 2005, $4,000.00 in equity in the

Debtors' home and $200 in a John Deere riding lawnmower. On March 25, 2005, the exempt

garnished funds were returned to the Debtors. Mrs. Gamble testified that prior to filing

bankruptcy she sought credit counseling but was ineligible as the agency explained because the

Debtors did not meet the minimum debt requirement. The United States Trustee argues that the

Debtors financial problems predate Mr. Gamble's injury as evidenced by both state and federal

claims for 2002 income taxes.

The United States Trustee urges that this case is one of substantial abuse because

he asserts that the Debtors have the ability to repay a substantial portion of their unsecured debt

in a thirty-six month Chapter 13 plan and that several of the Debtors' monthly expenses are

excessive and unreasonable. To arrive at each Debtor's net monthly income at the time of filing,

the United States Trustee multiplied the Debtor's net weekly income as stated on Debtors'

Exhibit I by 4.333. Debtors' Exhibit I lists Mr. Gamble's net weekly income as $740.00, which

results in a net monthly income of $3,182.00, and Mrs. Gamble's net weekly income as $260.00,

---

[13] Mr. Gamble testified that the medical debt which led to the garnishment was unrelated
to his September 2004 bank injury.

which results in a net monthly income of $1,118.00. As such, the United States Trustee

calculates the Debtors' joint net monthly income to be $4,300.00. The figure compares with the

Debtors' combined monthly income of $4,478.68 as reported on Schedule I. After deducting the

monthly expenses totaling $4,098.00 as reported on Debtors' Exhibit I and making a $100

monthly adjustment to the monthly entertainment expense of $160.00 and the $180.00 monthly

expense for Mr. Gamble's food and drinks while on the road for work[14], the United States

Trustee contends that the Debtors have at least $300.00 per month in disposable income to

contribute to a Chapter 13 plan. In a thirty-six month Chapter 13 plan, the United States Trustee

calculates that the Debtors would pay 22% of their general unsecured debt and 100% of their

unsecured priority debt.

The United States Trustee further argues that the Debtors expenses as listed on

Schedule J "appear inflated - particularly for baby sitting child care and 'incidental expenses.'"

(Mot. Dismiss 4.) Debtors' Exhibit I, which the parties stipulated was an accurate calculation of

expenses, reduced baby sitting and child care costs by $185.00 per month and incidental

expenses by $105.00 per month. Further, the United States Trustee argues that the $846.04

difference in the Debtors' total monthly expenses as reported on Schedule J and Exhibit I is

"largely attributable to changes in the debtors' secured debt rather than economies that the

debtors have adopted in their daily expenses." (United States Trustee's Post Trial Mem. 5.) The

Debtors were relieved of paying $415.29 per month as the Court avoided the liens held by

---

[14] The United States Trustee argues that "the testimony of the debtors showed that the
items for entertainment ($160) and for Mr. Gamble's food and drinks on the road ($180) were
either overstated or unnecessary. . . . The debtors offered [an] explanation of these items [but] did
not offer any reason why they should not be able to make at least $100 in monthly adjustments in
these two items." (United States Trustee's Post Trial Mem. 4.)

Pioneer Credit, which had a $220.29 per month payment, and World Financial, which required

the Debtors to make a $77.00 monthly payment and allowed the Debtors to redeem Superior

Financial's lien; thus reducing the Debtors' monthly payment on this obligation by $118.00.

However, the remainder of the difference, $430.75, is the result of changes the Debtors made to

their budget, specifically reducing their monthly food budget by $125.00 and eliminating dry

cleaning totaling $100 a month in addition to the reductions noted above. In addition, the United

States Trustee argues that Mr. Gamble's monthly contribution to his 401(k) plan must be

included in the Debtors' disposable income. On Schedule I, the Debtors reported Mr. Gamble's

monthly 401(k) contribution to be $232.52. At trial, Mrs. Gamble testified that shortly before

filing bankruptcy Mr. Gamble reduced his monthly contribution to $108.00 and that he was

continuing to contribute this reduced amount to his 401(k) plan.

Despite making these changes to their budget, Mrs. Gamble testified that the

Debtors were unable to live within either the budget on Schedule J or Debtors' Exhibit I.

According to Mrs. Gamble's testimony, the Debtors are not making the $60.00 monthly payment

to the IRS nor the $100 monthly payment to the Va. Department of Taxation and have not made

a payment on their car for five months. The Debtors were unable to provide an explanation of

how they have spent this money.

In his post-trial arguments to the Court in support of the Motion to Dismiss, the

United States Trustee has focused his attention on three areas: the Debtors' ability to repay a

substantial portion of their unsecured debt, the excessiveness and unreasonableness of the

Debtors' monthly budget, and the misstatement of the Debtors' combined monthly income. In

his opening statement at trial, however, counsel for the United States Trustee stated that the

accuracy of the Debtors' schedules was not being challenged and that the substantial abuse

motion turned on two factors: ability to pay and unreasonable and excessive living expenses.

*Ability to pay*

For the purpose of this decision, the Court will assume the correctness of the United States Trustee's contention that the Debtors should have the ability to reduce their living expenses sufficiently to permit them to propose a $300.00 per month Chapter 13 plan for thirty-six months which would support a plan which would pay 100% of their priority debt of $4,449.30 and 22% of their general unsecured debt of $23,415.37. Such a payout to creditors would be approximately 34.5% of their total unsecured debt.

*Excessive and unreasonable family budget*

The United States Trustee has not presented any evidence of lavish spending, such as the purchase of luxury consumer goods, by the Debtors. He has taken them to task for not being able to reduce their living expenses to fit the joint income they are earning. The Court does find that the Debtors, by more careful management of their finances, could live reasonably, albeit not liberally, on their aggregate income. For example, Mr. Gamble is accustomed to eating two meals on the road each workday and the parties budget $9.00 a day for his meals and soft drinks. When the Court inquired whether they had considered making sandwiches at home and "packing" a lunch, there was no indication that they had ever thought of doing so.

*Accuracy of the Debtors' schedules*

The United States Trustee asserts that the Debtors miscalculated their combined net monthly income on Schedule I and Debtors' Exhibit I. The Court finds no intent on the

-10-

Debtors' part to mislead either their counsel or the Court with respect to the information

contained in their schedules and notes that their reported incomes in Schedule I exceeded the

amount ultimately argued by the United States Trustee to be the correct amounts of such income.

*Bad faith*

The United States Trustee "does not contend that the [D]ebtors made cash

advances or consumer purchases in anticipation of their filing, or question the good faith of

[their] filing." (United States Trustee's Post Trial Mem. 3.)  The Court finds no bad faith on the

part of the Debtors.

CONCLUSIONS OF LAW

This Court has jurisdiction of this proceeding by virtue of the provisions of

28 U.S.C. §§ 1334(a) and 157(a) and the delegation made to this Court by Order from the

District Court on July 24, 1984.  A motion to dismiss for substantial abuse is a "core" bankruptcy

matter pursuant to 28 U.S.C. § 157(b)(2)(A).

A court may dismiss a Chapter 7 bankruptcy case upon a motion by the United

States Trustee if the case is filed by a debtor with primarily consumer debts and granting relief

would be a substantial abuse of Chapter 7 provisions. 11 U.S.C. § 707(b).  *Collier on Bankruptcy*

points out that Congress was concerned with the abuse of consumer debt and that § 707(b) of the

Code was adopted as "part of a package of consumer credit amendments" included in the

Bankruptcy Amendments and Federal Judgeship Act of 1984.  6 *Collier on Bankruptcy*

¶ 707.LH[2] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.).  Section 707(b) only

applies to an individual debtor whose debts are "primarily consumer debts."  Rule 1017(e) of the

-11-

Federal Rules of Bankruptcy Procedure, implementing this section, provides that the "United

States [T]rustee shall set forth in the motion all matters to be submitted to the court for its

consideration at the hearing." It is unmistakably clear that such motions are not to be readily

granted and that the onus is upon the United States Trustee to prove that the case is abusive, both

by the quoted language in Rule 1017(e) and also by the last sentence in § 707(b), granting a

presumption in favor of the debtor.

The Bankruptcy Code does not attempt to define "substantial abuse" and courts

have struggled to apply this provision given the plethora of factual situations presented by

debtors.  In summary, Congress appears to have been concerned about persons who knowingly or

recklessly live beyond their means, who live the good life using the resources of their creditors to

do so and then choose to walk away from their debts even though they have the financial ability

to pay them and although their income levels may have given them the access to the credit

markets which have made their liberal lifestyles possible.[15]

---

[15] *Collier on Bankruptcy* points out that in enacting § 707(b),

> Congress rejected attempts by the consumer credit industry to permit
> creditors to move for dismissal of cases on the basis that the debtor had
> an ability to pay debts.  It also rejected the idea that a case should be
> dismissed simply because a debtor could pay a "reasonable portion" of
> his or her debts (defined as 50%), as well as the use of a five year period
> to determine whether such portion could be paid. The resulting section
> 707(b) is thus more narrow than the provisions originally sought be the
> consumer credit industry and targeted only at debtors who can pay their
> debts without difficulty.

6 *Collier on Bankruptcy* ¶ 707.LH[4] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.).

-12-

The Fourth Circuit Court of Appeals has adopted a "totality of the circumstances" test in determining whether substantial abuse has occurred. *Green v. Staples (In re Green)*, 934 F.2d 568, 570 (4th Cir. 1991). In *Green*, the Court listed a number of factors to be considered:

> (1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;
> (2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;
> (3) Whether the debtor's proposed family budget is excessive or unreasonable;
> (4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and
> (5) Whether the petition was filed in good faith.

*Id.* at 572. The *Green* court further held that:

> Exploring these factors, as well as the relation of the debtor's future income to his future necessary expenses, allows the court to determine more accurately whether the particular debtor's case exemplifies the real concern behind Section 707(b): abuse of the bankruptcy process by a debtor seeking to take unfair advantage of his creditors.

*Id.* The Court in *Green* further pointed out that a vast majority of circuit courts have held that the debtor's ability to repay is the primary factor to be considered. *Id.* District Judge Kiser of this District has recently analyzed *Green* in *In re Harrelson*, 323 B.R 176 (W.D. Va. 2005). This opinion offers a thorough recent analysis by a court to which an appeal from this Court lies detailing how a motion pursuant to § 707(b) for alleged substantial abuse ought to be determined. This Court will undertake, therefore, to apply the methodology of that decision in deciding the present Motion.

*Ability to repay*

In *Harrelson*, Judge Kiser emphasized that "the ability to repay, although not a dispositive factor, is the primary factor in determining substantial abuse." *Id.* at 179 (citing *Shaw*

-13-

*v. U.S. Bankr. Adm'r*, 310 B.R. 538, 540 (M.D. N.C. 2004) and *In re Norris*, 225 B.R. 329, 331-32 (Bankr. E.D. Va. 1998)).  Judge Kiser went on to note that *Green* requires courts to look at the totality of the circumstances.

> A court may not dismiss debtors' ability to repay debts as an irrelevant factor. On the contrary, it is the primary factor in determining substantial abuse. . . . Courts have held that a debtor's ability to repay weighed in favor of a substantial abuse finding when the debtors could only pay 29% and 47% of their unsecured debt over a period of three years.

*Id.* at 180 (citing *Shaw*, 310 B.R. at 540 and *Norris,* 225 B.R. at 332).  The *Green* opinion expressly recognizes, however, that "solvency alone is not a sufficient basis for a finding that the debtor has in fact substantially abused the provisions of Chapter 7." *Green,* 934 F.2d at 572.  The Court has assumed for the purpose of this decision that the Debtors could, by more stringent management of their living expenses, propose a Chapter 13 plan which would allow a distribution of approximately 34.5% of their total unsecured debt, but only 22% of their general unsecured non-priority debt.  The former figure is within the permissible range expressly approved in *Harrelson*, but the latter one is below such range.

*Petition filed as a result of a sudden illness, calamity, disability or unemployment*

The court in *Harrelson* held that this factor weighs in favor of dismissal when the filing is not due to some "unforeseen tragedy." *Harrelson,* 323 B.R. at 178 (citing *Norris*, 225 B.R. at 333).  A garnishment of one's salary is certainly a reasonable and common precipitating factor in the filing of a bankruptcy petition, but it cannot reasonably be said to constitute a "tragedy."  Relief from such a garnishment can be obtained in a chapter 13 filing as well as one under chapter 7.  The Debtors did suffer both unemployment (Mrs. Gamble) and short-term disability (Mr. Gamble) in the year preceding their bankruptcy filing.  While the Court doesn't

-14-

believe that such events were of sufficient magnitude to cause their bankruptcy filing, they

obviously impacted their circumstances adversely and, at the least, probably accelerated their

financial crisis.  The Court concludes that the decision to file bankruptcy was the result of a

confluence of their existing precarious financial situation as a result of their lack of budget

discipline and the impact of their health and employment problems upon that condition.  Under

these circumstances the Court believes that such factor is neutral in the substantial abuse

calculus.

*Whether the Debtor incurred cash advances or made consumer purchases far in excess of his*
*ability to pay*

Case authority on this point varies widely.  In *In re Vansickel*, 309 B.R 189, 211-

12 (Bankr. E.D. Va. 2004), the court held that "relatively modest" debts including $28,000 in

unsecured debt did not weigh in favor of dismissal, holding that due to the statutory presumption

in favor of granting a debtor bankruptcy relief, the United States Trustee did not meet his burden

of proof in establishing substantial abuse. In *In re Norris*, 225 B.R. at 333-34, however, the court

held that this factor did weigh in favor of dismissal when the debtors incurred more than $90,000

of unsecured debt, lived in an expensive home, dined out, and utilized their 401(k) plans to create

a reserve fund for future expense.  Additionally, another district court held this factor weighed in

favor of dismissal when the debtors purchased a $4,000 bedroom suite, spent $1,000 a month for

their daughter's college expenses, lived in a home they could not afford but were unwilling to

leave, and purchased two new cars. *Shaw,* 310 B.R. at 540-41.  Those factors are not presented in

this case and this factor weighs in favor of the Debtors.

-15-

*Excessive and unreasonable family budget*

       The Debtors do not have an easy life and they obviously work hard.  Mr. Gamble

works ordinarily a 14 to 15 hour day and generally leaves home about 4 a.m.  Mrs. Gamble

works all night as a nursing aide.  Nevertheless, during the two years before their bankruptcy

filing they had earned together over $60,000.00 a year.  This amount should have been sufficient

to permit them to live within their means.  Accordingly, while there is nothing in their budget

which might be reasonably characterized as lavish, it yet must be said that it is unreasonable in

light of their inability to pay their regular expenses of living.

*Accuracy of the Debtors' schedules*

       While certainly some fault might be ascribed to the complete correctness of the

Debtors' reported income and expenses, the Court sees no reason based on the evidence to depart

from the opening statement of the United States Trustee's counsel that the accuracy of the

schedules was not being challenged.  Because Mr. Gamble was paid a percentage of the revenue

generated from the loads of fuel he delivered, determination of his average monthly income was

not an easy thing to do.  The Court concludes that the Debtors reasonably and fairly represented

their financial circumstances in their bankruptcy schedules.  This factor weighs in the Debtors'

favor.

*Bad faith*

District Judge Ellis of the Eastern District of Virginia in *McDow v. Smith*, 295

B.R. 69 (E.D. Va. 2003), a case involving a motion to dismiss for "cause" under 11 U.S.C. §

707(a), stated generally that "a debtor's 'bad faith' or 'lack of good faith' is evidenced by the

debtor's *deliberate* acts or omissions that constitute a misuse or abuse of the provisions, purpose,

or spirit of the Bankruptcy Code." *Id.* at 74 (emphasis added). Of particular significance on this

point would be a finding of wrongdoing on the part of the debtor, either in the accumulation of

the debt or in the filing of the Chapter 7 petition. *Id.* at 82. Most cases resulting in a finding of

bad faith involve egregious factual situations wherein the debtor has accumulated massive

amounts of credit card debt with no intent to repay the debt, lives a lifestyle far above what he or

she could afford and/or intends to avoid a large single debt. *In re Zick*, 931 F.2d 1124, 1129 (6th

Cir. 1991); *see also In re Haddad*, 246 B.R. 27, 38 (Bankr. S.D. N.Y. 2000) (in addition to living

an extravagant lifestyle, debtor was not candid in disclosure requirements and attempted to claim

a wedding band as exempt while unmarried); *In re Ragan*, 171 B.R. 592, 596 (Bankr. N.D. Ohio

1994) (case dismissed under 707(b) after debtor withdrew more than $160,000 from IRA and

recklessly spent it all with little or no regard for obligations to creditors).  The Court finds no

such indication of bad faith on the Debtors' part. Therefore, this factor weighs against granting

the Motion.

*Other factors*

The Court of Appeals's opinion in *Green* did not hold that the factors it

enumerated were exclusive or exhaustive.  It adopted a "totality of circumstances" test which

called for consideration of factors "such as" the ones specifically listed.  *Green,* 934 F.2d at 572;

*see also Vansickel,* 309 B.R. at 169 n.9 (stating that the *Green* list is illustrative rather than

exhaustive).   The Court concludes that there are two additional circumstances which ought to be

considered.  Both favor the Debtors.  The first of these is that the Debtors had sought credit

counseling before filing bankruptcy but still had been unable to right their financial ship before

having to face the financial crisis presented by the garnishment of Mr. Gamble's income.  The

second of these is that the $4,449.30 in priority debt which would be paid under a Chapter 13

plan before any distribution to general unsecured non-priority creditors all appears to be non-

dischargeable pursuant to 11 U.S.C. §§ 523(a)(1)(A), 507(a)(8)(A)(I) and 507(a)(8)(B).

Consequently, the Debtors will have to find a way to get control of their finances so that such

non-dischargeable debts can be paid.  More pointedly, they still will have to pay such obligations

even after obtaining a Chapter 7 discharge.

## DECISION

In the Court's judgement this case was a very weak one to bring to trial on a claim

of substantial abuse.  While the Debtors certainly are not by any means free of all blame in the

cause of their financial collapse, such fact coupled with a purported ability to propose a Chapter

13 plan which would permit a relatively modest distribution to general unsecured creditors falls

far short of a substantial abuse of Chapter 7.  Approximately a third of their general unsecured

debt was medical debt and they had no substantial credit card obligations.  The Court concludes

that there is scant evidence that the Gambles sought to take "unfair advantage of [their] creditors"

within the meaning of the *Green* opinion.  934 F.2d at 572.  Accordingly, the United States

Trustee's Motion will be denied by separate order.


This 2nd day of June, 2006.


William F. Stone, Jr.
_____
UNITED STATES BANKRUPTCY JUDGE